# UNITED STATES DISTRICT COURT
for the
Eastern District of California

SEALED

FILED
Jul 30, 2026
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

United States of America
v.
Danavon Caine

*Defendant(s)*

Case No. 1:26-mj-00093-FJS

## CRIMINAL COMPLAINT BY RELIABLE ELECTRONIC OR TELEPHONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of July 17-18, 2026 in the county of Mariposa in the Eastern District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| 18 U.S.C. Section 2242(3) | Sexual Abuse, punishable by life imprisonment, or $250,000 fine and 5 years of supervised release, $100 Special Assessment. |

This criminal complaint is based on these facts:

See affidavit of Special Agent Frank R. Quinto, National Park Service Investigative Services Branch, attached hereto and incorporated herein.

☑ Continued on the attached sheet.

*Complainant's signature*

Frank R. Quinto, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone

Date: July 29, 2026

*Judge's signature*

City and state: Fresno, California

Hon. Frank J. Singer, U.S. Magistrate Judge
*Printed name and title*

ERIC GRANT
United States Attorney
ERIC CATTO
CALVIN LEE
Assistant United States Attorneys
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099
Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DANAVON CAINE,<br><br>Defendant. | CASE NO.:<br><br>AFFIDAVIT OF NATIONAL PARK SERVICE SPECIAL AGENT FRANK R. QUINTO |

I, Frank R. Quinto, being duly sworn, do hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the National Park Service ("NPS") Investigative Services Branch ("ISB"). I have been employed as a Special Agent with the National Park Service since November of 2025. From 2010 to 2025, I was a uniformed Law Enforcement Officer ("LEO") for the NPS.

2. I am a graduate of the Northern Arizona University NPS Seasonal Law Enforcement Ranger Academy, Federal Law Enforcement Training Center's ("FLETC") Land Management Police Training Program, and FLETC Criminal Investigator Training Program. My primary duties include detecting, investigating, apprehending, and prosecuting criminal activity on and relating to public lands administered by the NPS.

3. I have investigated a multitude of crimes that have occurred on public lands administered by the NPS. Some of the investigations I conduct involve assaults, sexual offenses, and other violent crimes that have occurred within NPS lands.

4. I am an "investigative or law enforcement officer" of the United States, within the meaning of that term defined at 18 U.S.C. § 2510(7), who is empowered by law to conduct investigations of, and to initiate arrests for, various offenses that occur on or affect NPS lands.

5. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience. Based upon the facts set forth in this criminal complaint, I believe probable cause existed to believe that Danavon Caine (hereinafter referred to as "**CAINE**"), violated Title 18 of the U.S. Code, Section 2242(3) (Sexual Abuse) on July 17-18, 2026, within Yosemite National Park

## APPLICABLE LAW

6. Title 18 U.S. Code § 2242(3) *"Whoever, in the special maritime and territorial jurisdiction of the United States knowingly engages in a sexual act*[1] *with another person without that other person's consent, to include doing so through coercion; or attempts to do so, shall be find under this title and imprisoned for any term of years or for life."*

---

[1] As defined by 18 U.S. Code § 2246(2)(a) the term "sexual act" means – (A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight; (B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus; (C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or (D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person;

**JURISDICTION**

7. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

8. The facts in support of this affidavit occurred within Yosemite National Park. Yosemite National Park is an area of federally owned public land administered by the NPS. Yosemite National Park is an area of the special maritime and territorial jurisdiction of the United States as defined by Title 18 U.S.C. § 7 (3); and by Title 16 U.S.C. § 57. Yosemite National Park is located within Mariposa, Madera, Mono and Tuolumne Counties, all of which are located within the Eastern District of California.

**PERSONS AND CRIMINAL OFFENSES**

9. This affidavit is submitted in support of an arrest warrant to **Danavon Anthony CAINE** for violation of Title 18, U.S.C. § 2242(3).

**STATEMENT OF PROBABLE CAUSE**

10. At approximately 12:23 p.m. on July 18, 2026, the Yosemite National Park Emergency Communications Center ("YNP ECC") received a call from a subject who wanted to file a report of a sexual assault. The call was transferred to NPS Law Enforcement Officer Michelle Clark. Officer Clark contacted the reporting party, identified as J.T., at the manager's office at the Basecamp Eatery in the Yosemite Valley Lodge. J.T. is a 19-year-old adult female. Officer Clark requested that J.T. come to the Yosemite Clinic to be interviewed and J.T. agreed.

11. Officer Clark and Officer Sydney Emley interviewed J.T. at the Yosemite Clinic. During the interview, J.T. indicated she has worked for the Yosemite Hospitality Corporation in Yosemite National Park for four months. At the time of the interview, she was employed as a chef at the Mountain Room restaurant at Yosemite Valley Lodge. My investigation revealed that her assailant, Danavon **CAINE,** has been working for Yosemite Hospitality Corporation as a chef at the Mountain Room at Yosemite Valley Lodge since May 20, 2026. **CAINE** is a 37-year-old adult male. **CAINE** and J.T. have

communicated since May 21, 2026, or earlier. J.T. provided screenshots of text messages from May 21, 2026, through July 18, 2026, between **CAINE** and herself.

12. On July 18, 2026, J.T. told investigators that **CAINE** had asked J.T. to hang out after their work shifts on July 17, 2026. J.T. stated they had hung out before, so she "thought they were cool," which appeared to mean that she thought they were platonic friends. J.T. met with **CAINE** at approximately 11:30 p.m. on July 17, 2026, at the Garden Terrace room at Yosemite Valley Lodge shortly following the end of J.T.'s kitchen shift. J.T. and **CAINE** then walked to **CAINE**'s residence located at H1000A Yosemite Lodge Drive, Yosemite National Park, CA 95389 (hereinafter referred to as the "**CAINE**'s Residence") at the Yosemite Valley Lodge employee housing area. Both J.T. and **CAINE** sat on a cot in a grassy area behind **CAINE**'s Residence and they looked at the stars.

13. J.T. was venting to **CAINE** about issues in the workplace and **CAINE** abruptly shifted the conversation towards sex. This made J.T. uncomfortable. She stated, "And this entire time, I'm like, this guy's my friend, we aren't doing that stuff." About an hour into the conversation, J.T. described that she, "got overwhelmed because he was, he was just like, 'all the crazy things I would do to you,' and I was like, 'what do you mean?' He is like, 'do you want me to show you?' And he is like [saying], 'lay down.' And I don't really know what happened in that moment. My mind kind of just went black and I laid down and he just started taking off my clothes. And I don't know, may[be] it was consensual at first, but he was just on top of me and like kissing me and stuff." **CAINE** was then on top of J.T. and was kissing her.

14. According to J.T., "[**CAINE**] went down on me. I was, like, pushing his head. I was like, 'Stop, wait wait wait wait, stop stop.' And I kept saying 'Stop.'" Officer Emley asked J.T. how many times she told **CAINE** to stop while he was performing oral sex on her. J.T. stated "So many. Maybe like four or five times. And I was like physically pushing him, too." J.T. stated "I was, like, laying on my back, and he was, like, holding, like, with my legs back, like, stretching me, and I cannot stretch. He grabbed my legs and, like, held them back, and like, he was on top of me." J.T. then told the officers "He didn't stop. It was all like in the strain of events. So, the only time he stopped was to get up and, like, reposition himself. Like, I mean like, when he got up from, from, like, going down on me. That's like, when he like, took my, my legs and, like, kind of like, hoisted them up, like on his shoulders, and

then was holding me, and then he started, like, penetrating me." J.T. repeatedly told **CAINE** to stop and tried to push him off her. She stated, "And I was like pushing him harder this time, I was pushing him before but now I'm, like pushing him like much harder, with as much force as I can use, and only then did he actually get up."

15. J.T. clarified that **CAINE** had penetrated her with his penis for about a minute or two. He did not wear a condom, and she did not think he ejaculated in her. After **CAINE** stopped, J.T. put her clothes back on. **CAINE** walked J.T. home (approximately 1 mile away). She stated, "And the entire time he was walking me home he, like, had his arm around me. I wanted him to leave me alone and stop touching me." Once J.T. got home, she changed her clothes and used the bathroom. J.T.'s sole roommate was not home, so she was all alone. J.T. also reported she began "panicking," saying "No, no, no, no." over and over to herself. She then walked over to a friend's house at approximately sometime after 1:00 a.m. This friend encouraged her to report what happened.

16. After the interview, J.T. took Officer Clark, Officer Emley, and NPS Special Agent Cullen Tucker to the grassy area behind the **CAINE**'s Residence. Officers searched the grassy area and found no obvious evidence of a sexual assault. They also went to J.T.'s residence at the Lost Arrow Cabins and collected the clothing she wore during the assault (black leggings and a red sweater) and later submitted into evidence.

17. On the evening of July 18, Officer Emley transported J.T. to the Family Healing Center in Fresno, California, to undergo a sexual assault forensic exam ("SAFE"). While in route to Fresno, J.T. received a call from **CAINE**. She did not answer the phone. **CAINE** sent her a series of text messages stating: "Hey what's up", "did you tell a lie on me or something?" and "If you did please make it right because you know I wouldn't harm you or anyone in anyway." These texts came from a cellular telephone assigned call number (530) 364-7662, which J.T. confirmed is the phone number for **CAINE** that he provided to her. Officer Emley told J.T. not to respond or delete the messages. While waiting for the results of the SAFE exam, J.T. noticed a red mark on her neck. Officer Emley photographed the red mark and informed the medical examiner. The SAFE exam report states that J.T. told the examiner "He had his hand on my neck and moved it to hold my hands down."

18. On July 20, 2026, Yosemite Hospitality Human Resources Manager Jamie Schaftary stated to investigators that **CAINE** is a Jamaican national and is on an H2-B visa. He is on a 6-month assignment through October. A criminal history check on **CAINE** showed no records found in the United States.

19. On July 22, 2026, NPS Special Agent Kristy Smith interviewed J.T. at the NPS Investigative Services Branch office in the Yosemite Law Enforcement Office. During the interview, J.T. stated that **CAINE** was wearing a dark colored shirt, blue jeans, and dark colored boxer shorts. J.T. also described a dark colored "lawn chair thing" that was similar to a cot that **CAINE** brought out to for both of them to sit on. J.T. stated that the sexual assault occurred on this lawn chair type of seat and that **CAINE** had retrieved this seat from the premises of **CAINE**'s Residence before sitting down with J.T. in the clearing. J.T. explained to Special Agent Smith that **CAINE** wrapped both of his arms around her legs and forcefully pulled her body to him. **CAINE** then placed one of his hands on her throat and applied pressure with his hand and fingers to the side of her neck. J.T. stated that she thought **CAINE** was going to strangle and kill her. J.T. stated that she froze but continued to try to fight him off of her. J.T. stated that after she went home, she started to realize what happened and knew she needed to get help. She went outside to find someone, and she saw "a skinny white guy" with a crutch that lived next door to her. J.T. told him something bad happened to her but decided not to tell him what happened. She then went to a dorm nearby and met with her friend to tell them what happened.

20. On July 28, 2026, law enforcement personnel interviewed A.P., J.T.'s neighbor, A.P. A.P. confirmed that J.T. walked up to him late in the evening on Friday night (July 17, 2026) while he was smoking a cigarette on his front porch. A.P. stated that J.T. asked him for a cigarette, which seemed strange to him because she does not smoke. He noticed that she did not really even smoke that cigarette. She appeared to be frightened and scared. He said J.T. thought she might have been "slipped" something. Based on my review of the interview footage, it appeared to me that A.P. understood that J.T. was talked about having been sexually assaulted. She said she felt upset and thought it was her fault. She was tearing up as she was talking to him. A.P. did not ask any specifics and he did not know who J.T. had been with that evening. He said J.T. did not appear to be intoxicated, but she seemed frightened and distressed. He gave J.T. a side-hug when she left. A.P. saw J.T. walk over to the dorms.

21. On July 23, 2026, Special Agent Tucker and NPS Special Agent Cooper Fouch interviewed J.T.'s friend that she met with after the assault, identified as Z.W., at the NPS Investigative Services Branch office in the Yosemite Law Enforcement Office. During the interview, Z.W. stated that J.T. knocked on her residence door, without prior planning, at approximately 12:30 a.m. on Saturday, July 18, 2026. Z.W. reported that J.T. appeared to be upset, since she was crying and clutching a Lelo and Stitch plushie. Z.W. stated that J.T. told her that she had been hanging out with a male co-worker after work earlier that evening. J.T. told Z.W. the male co-worker was approximately 10 years older than her. J.T. did not tell Z.W. who the male co-worker was. J.T. told her there were some consensual acts at first, but did not give any specific details about what they were. J.T. told her that she then told the male co-worker to stop and that she had to force him off of her. Z.W. stated that she did not ask J.T. any details about the assault and was focused on calming and consoling J.T. because J.T. was crying when she was telling Z.W. about what happened. Z.W. estimates that J.T. was at her residence for approximately 30 minutes.

22. On July 23, 2026, Special Agent Tucker, Special Agent Cooper, several other NPS Law Enforcement Officers and I went to **CAINE**'s Residence to serve a federal search warrant. **CAINE** agreed to talk to us. Special Agent Tucker and I drove **CAINE** to the NPS Investigative Services Branch Office at the Yosemite Law Enforcement Office. Special Agent Tucker read **CAINE** his *Miranda* rights. CAINE waived his rights and agreed to talk to us. **CAINE** also signed an NPS *Miranda* rights waiver form. **CAINE** stated that he is a cook at the Mountain Room restaurant at the Yosemite Valley Lodge. He started his season on May 20th or May 21st of 2026. During this interview, **CAINE** acknowledged that he had sex with J.T. on July 17, 2026, but stated that it was consensual.

**CONCLUSION**

23. Based on the foregoing, I believe there is probable cause that **CAINE** committed Sexual Abuse in violation of 18 U.S. Code § 2242(3).

Frank R. Quinto
Special Agent, National Park Service

Affidavit submitted by email/pdf and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3).

Hon. Frank J. Singer
United States Magistrate Judge

Reviewed and approved as to form:
*/s/ Eric A. Catto*
Eric A. Catto
Assistant United States Attorney